COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Fitzpatrick, Judges Elder and Bumgardner
Argued at Richmond, Virginia


PETRI MADELINE VANDERVEER

                                              MEMORANDUM OPINION[*] BY
v.        Record No. 0122-04-2        CHIEF JUDGE JOHANNA L. FITZPATRICK
                                              SEPTEMBER 28, 2004
ROBERT ALLEN VANDERVEER


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Paul M. Peatross, Jr., Judge

        John H. Kitzmann (Davidson & Kitzmann, PLC, on briefs), for
        appellant.

        S. Braxton Puryear for appellee.


Petri Madeline Vanderveer (wife) appeals the transfer of primary custody of her son,

Michael Vanderveer (Michael), to Michael's father, Robert Allen Vanderveer (husband), pursuant

to Code § 20-124.2(B).  She contends that the trial court erroneously based its ruling solely on

wife's unmarried cohabitation with Christopher Collins (Collins), and wrongly concluded that

the custody transfer was in Michael's best interests.  We hold that the trial court did not err in

transferring custody from wife to husband, and affirm.

I.  BACKGROUND

"On appeal, we construe the evidence in the light most favorable to [husband], the

prevailing party below, granting to [his] evidence all reasonable inferences fairly deducible

therefrom."  Donnell v. Donnell, 20 Va. App. 37, 39, 455 S.E.2d 256, 257 (1995) (citing

McGuire v. McGuire, 10 Va. App. 248, 250, 391 S.E.2d 344, 346 (1990)).

---

[*]  Pursuant to Code § 17.1-413, this opinion is not designated for publication.

So viewed, the evidence established that husband and wife were married on July 2, 1994, separated on August 10, 2001, and entered into a separation agreement on August 9, 2002. Their separation agreement was incorporated into a final decree of divorce, entered by the Albemarle County Circuit Court on October 21, 2002. The agreement granted primary physical custody of Michael to wife.

During the marriage, husband and wife lived in Charlottesville. Husband worked first as a contractor for his father, then, after Michael was born, he was employed full-time in the Active Guard Reserve of the Virginia National Guard. Wife began working as a nanny a few months after Michael's birth so that she could take Michael to work with her. After the separation, wife moved about an hour outside Charlottesville, and husband remained in Charlottesville. Husband was involved in Michael's life both during and after the separation and divorce, and cared for him often. Husband and wife would meet between their homes near Charlottesville to exchange Michael for husband's visits. Husband's visitations were usually every other week for three nights during this time. Michael was also close to husband's large extended family, including four cousins, who live in the Charlottesville area.

Husband was deployed to Guantanamo Bay, Cuba in December 2002 as a member of the Virginia Army National Guard Reserve, and returned to the United States in September 2003. After husband's deployment, Michael visited with husband's parents every other weekend. Husband spent several days of his two leaves from Cuba with Michael.

In January 2003, while husband was deployed, wife informed him that she had relocated to Florida with Michael in order to live with Christopher Collins, a man she had met in a bar in Charlottesville in September 2002. She gave husband no prior notice that she was moving to Florida with Michael:

Q: You never said anything to [husband] about your plans to move?

A: No.

Q: You never said anything to his mother?

A: I didn't think it was relevant, since Rob was going to be leaving, and he was going to be gone for a year, possibly longer. Who knew?

Q: And you intended to take Michael with you when you moved?

A: Correct.

Q: And Rob's parents were close to Michael, isn't that correct?

A: Could have been closer, but correct.

Q: Okay. And he has a number of cousins in the area?

A: Right.

Q: The Vanderveers were a close family?

A: (No audible response.)

Q: And you didn't think it was relevant to discuss that you were moving to Florida?

A: No, sir.

Q: It wasn't a matter of giving thirty days notice in advance. It wasn't a matter of saying a couple of days before you left. The Vanderveers found out that you had moved to Florida after you moved. Isn't that correct?

A: Correct.

Q: You notified Rob by e-mail –

A: Right.

Q: - that you had moved?

A: (Indicate yes.)

Wife testified that she worked as a dental assistant while in Florida, and had plans to further her education. She also testified that she and Collins planned to get married in September 2004. Husband was released from active military duty in October 2003, and accepted a non-deployable position as an army recruiter in Charlottesville, where he planned to live permanently.

The trial court found that husband and wife were both good parents, but that it was in Michael's best interests that custody be transferred to father. It cited wife's unilateral decision to move to Florida without notice to husband, and the need for Michael, age three and a half at the time of trial, to be close to both parents. The court also cited wife's financial dependence on a man who was not her husband, the negative influence of her unmarried cohabitation with Collins on the child, and Michael's close relationship to father's extended family in the Charlottesville area.

After the trial court's ruling, wife married Collins. She then filed a motion to reconsider, which the trial court denied.

## II. ANALYSIS

On appeal, wife contends that the trial court erred in transferring primary custody to father.[1] We disagree.

"It is well settled in Virginia that the best interest of the [child] controls the issue of a change of custody or the issue of a custodial parent moving the children to another state." Simmons v. Simmons, 1 Va. App. 358, 362, 339 S.E.2d 198, 200 (1986). "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard

---

[1] Although wife lists fourteen assignments of error, the sole issue raised in this appeal is whether the trial court erred in transferring primary custody from the mother to the father under the facts of this case.

and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795

(1990).

> In reaching a decision on the best interests of the child, the court is guided by Code § 20-124.3, which specifies a myriad of factors appropriate to the issues of custody and visitation. However, as long as the trial court examines the factors, it is not required to quantify or elaborate exactly what weight or consideration it has given to each of the statutory factors. The trial court's determination of the child's best interests is a matter of discretion . . . , and, unless plainly wrong or without evidence to support it, the court's decree must be affirmed.

Sullivan v. Knick, 38 Va. App. 773, 783, 568 S.E.2d 430, 435 (2002) (internal citations and

quotations omitted), see also Bostick v. Bostick-Bennett, 23 Va. App. 527, 533, 478 S.E.2d 319,

323 (1996).

Wife contends that the transfer of custody was not in Michael's best interest and that the

trial court erroneously relied on wife's unmarried cohabitation with Collins as the sole factor in

determining that the transfer of custody was in Michael's best interest.[2]

"In determining the best interest of a child for purposes of determining custody or

visitation arrangements," the court must consider the following factors under Code § 20-124.3:

> 1. The age and physical and mental condition of the child, giving due consideration to the child's changing developmental needs;
> 2. The age and physical and mental condition of each parent;
> 3. The relationship existing between each parent and each child, giving due consideration to the positive involvement with the child's life, the ability to accurately assess and meet the emotional, intellectual and physical needs of the child;
> 4. The needs of the child, giving due consideration to other important relationships of the child, including but not limited to siblings, peers, and extended family members;
> 5. The role that each parent has played and will play in the future, in the upbringing and care of the child;

---

[2] Neither husband nor wife contests the trial court's ruling that a change in circumstances occurred.

6. The propensity of each parent to actively support the child's contact and relationship with the other parent, including whether a parent has unreasonably denied the other parent access to or visitation with the child;

7. The relative willingness and demonstrated ability of each parent to maintain a close and continuing relationship with the child, and the ability of each parent to cooperate in and resolve disputes regarding matters affecting the child;

8. The reasonable preference of the child, if the court deems the child to be of reasonable intelligence, understanding, age and experience to express such a preference;

9. Any history of family abuse as that term is defined in § 16.1-228. If the court finds such a history, the court may disregard the factors in subdivision 6; and

10. Such other factors as the court deems necessary and proper to the determination.

In making his ruling, the trial judge specifically cited the factors he considered:

> So, this Code section that I'm required to consider is 21-24.3 [sic] and there are a number of factors, ten specifically, that I need to consider. And the attorneys have addressed those in closing argument. And I have looked at those and considering what I need to do in this case. So, I've looked at age, physical and mental condition of the child. I've looked at the age, physical and mental condition of each parent. I've looked at the relationship between the parent and the child and the involvement of each parent's – involvement of each parent in the child's life, the ability to assess and meet emotional, intellectual, and physical needs of the child, the relationships of the child, including family, the role each parent's played in the life of the child and raising the child. The cooperation between the parents and permitting access to the child; preference of the child doesn't apply due to the child's age, and there's no history of any family abuse.

The trial judge elaborated more specifically on how these factors relate to the instant case:

> The big concern to the court is that, in a preferred world, this child should be able to be raised by Mom and Dad and have access to Mom and Dad . . . . In this situation, the mother's move to Florida has made that more difficult. Certainly the father being deployed made it more difficult to have continuing, constant contact with the child. His was not voluntary, hers was . . . there are [other] negative effects of [wife's move], in that she's moving in with this

- 6 -

man that is not the child's father; that there has to be a new relationship. It takes away – a constant contact between father and child by moving the child to Florida. And we're depending on a man to provide this financial support who has no legal obligation to do that. Much less, if you – if you want to be old fashioned, the moral atmosphere for the child is not one that the court looks on with favor. So, all that being said, having considered these factors, I find it's in the best interest of the child that if the father's going to be in Charlottesville with his family, that primary custody should be transferred to the father from the mother.

Credible evidence supports the trial court's ruling. The trial court was "not required to quantify or elaborate exactly what weight or consideration it has given to each of the statutory factors." Sullivan, 38 Va. App. at 783, 568 S.E.2d at 435 (internal citations and quotations omitted), see also Bostick, 23 Va. App. at 533, 478 S.E.2d at 323. Nevertheless, the trial court emphasized the need for the child to be near both parents, wife's voluntary removal of the child from contact with father and his extended family without notice, wife's reliance on a man who had no obligation to care for her or Michael for financial support, and the unmarried cohabitation's affect on the child.[3] Because the trial court's analysis sufficiently reflects its consideration of the factors set out in Code § 20-124.3, we cannot say that its judgment was plainly wrong or without evidence to support it.

Wife argues that Lawrence v. Texas, 539 U.S. 558 (2003), compels a different result. We disagree. That case is factually inapposite. While finding that the Texas sodomy law banning "deviate sexual intercourse" between consenting adults of the same sex, but not between consenting adults of different sexes is unconstitutional, the Supreme Court did not extend its ruling beyond that criminal context:

---

[3] The trial court clearly did not base its ruling solely on wife's unmarried cohabitation as appellant asserts, since it denied wife's motion to reconsider that was filed after she later married Collins.

- 7 -

> The present case does not involve minors.  It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused.  It does not involve public conduct or prostitution.  It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter . . . . The state cannot demean their existence or control their destiny by making their private sexual conduct a crime.

Id. at 578.

Thus, Lawrence does not prevent a trial court from considering the atmosphere present in a parent's home in determining the best interest of the child.  See also Piatt v. Piatt, 27 Va. App. 426, 499 S.E.2d 567 (1998).

Accordingly, we affirm the judgment of the trial court.

Affirmed.